We'll now move on to the next argument on the calendar. This one is via Zoom, so Ms. Molina is going to work her magic and get them up on the screen, hopefully. This is Friend v. Gasparino and City of Stamford. Let me make sure we've got council on the line. Oh, that looks like it works. Okay, just give us a second. Okay, do you have the sheet? So, council, I'll make sure in a minute that you can hear us, we can see you. For whatever reason, we are numbered, not named. So, Judge Menasci is Judge 3, I am Judge 5, and Judge Lynch is Judge 7, which I guess makes Menasci, Babe Ruth, me, Joe DiMaggio, and Lynch, Mickey Mantle. All Hall of Famers, I would point out. All right, so let me just make sure we've got everybody on the line and their video is working. So, Mr. Barrett, can you see and hear us? I can, Your Honor. Can you hear me? Yes, loud and clear, and we can see you as well. And then for the defendants, Mr. Spector? Yes, I can hear you and see you well, thank you. Good, we can see and hear you. And finally, Ms. Coughlin, or is it Coughlin, how do you pronounce it? Actually, we can hear you. Are you on mute? Still not able to hear you. So far, no good. She was on earlier. Okay, look, these things happen sometimes. I will tell you what I haven't had to say in a while because we've mostly been doing this live lately. But if for whatever reason you get bounced off, don't panic. Just try to get right back on. We have Cracker Jack people nearby who are able to hopefully get you back on quickly, and we'll resume where we lost you. If it goes on for a long, long period of time, I guess there's a chance we would then move on to the next argument and then resume once we have you back. I don't think that will happen. I hear a voice. Are you able to hear me, Your Honor? Yes, we can. And can you see and hear us? Yes, I can. I apologize for that. And you were going to pronounce your last name for me, I think. Yes, you had it correct the first time. It's Barbara Coughlin. Okay, Ms. Coughlin. Great. Okay, so we'll start with Mr. Barrett. Mr. Barrett, you've got 12 minutes. You've reserved three for rebuttal. So the floor is yours. Thank you, Your Honor, and thank you to the court for accommodating us remotely this morning. My name is Dan Barrett. Along with my co-counsel and Lana Bildner, I represent my friend, Allen, in this case. And he brings to the court two broad subject areas, one being the speech clause claims in Counts 1 through 3 of the amended complaint, and the other being municipal liability for Section 1983 violations of the Counts 4 and 5. I should like to start with the speech clause claims, if I may. Both of those, all three of those claims ask the same question at their bottom, which is whether or not the government can punish a person for telling the public about police activity that's occurring on a public street. And although it does not matter to Mr. Friend which line of authority the court applies, there are twin lines of authority that both get us to the same place, which is strict scrutiny. On one hand, we have the line of cases that protects the republication of truthful, lawfully obtained information. And on the other hand, we have the age-old prohibition against content-based discrimination in speech restrictions. From Mr. Friend's perspective, it doesn't matter which one the court applies. Where we get to is strict scrutiny. And that means that although he is the appellant, I'm talking this morning, on the speech claims, Mr. Friend comes to you with a bit of a wind at his back in that he does not carry the burden. And the defendant at speech claims, Mr. Gasparino, is laboring under what RIB calls the heavy burden of unconstitutionality. He has not carried that burden for the reason that he has failed to show that his speech restrictions, he's levied two on Mr. Friend on the sidewalk that day, were narrowly tailored to accomplish a compelling government interest. Can I ask before we get to the scrutiny, I mean there's this debate over whether it was speech on a matter of public concern. And I guess my question is does that matter? Like usually we talk about whether something is speech on a matter of public concern in specific contexts like a defamation suit as to what standard would apply or government – retaliation against government employees. But here we have a claim that he was on a street and held up a sign and the government penalized him for his speech. If it was speech on a matter of purely private concern, would that make a difference? Only if the court should choose to apply the Bartmacke line of cases, that is the analysis involving the republication of lawfully obtained truthful information. But in that – within that line of cases, Your Honor, the threshold of public concern is quite low as we know from Snyder v. Phelps. That really all that's required is that the person be speaking information. Yeah, but Snyder v. Phelps, that's a state law claim for intentional infliction of emotional distress, right? And the question is whether you would allow the normal state law standards to apply to that kind of claim. Other things about publication or whether the government could stop publication I suppose. And other contexts are about government retaliation. But if he had – was standing on the side of the street with a sign that was about some personal grievance that just said somebody is mistreating me, could the government arrest him for the content of his sign? No, Your Honor, because of the content-based – the prohibition against content-based discrimination. Yes, I agree this is a somewhat unusual case in that you could even look at it through foreign analysis. But the answer is the same each way, which is that he was on the sort of quintessential public speaking area in our country. And it didn't particularly matter what he was saying as long as what he was saying was not, let's say, an enticement to engage in illegal activity or fell within any one of the very few First Amendment trap doors. So what if this had taken place in Little Italy or Ozone Park and John Gotti's Social Club and somebody had a sign that they held up and said the guy you're talking to is an undercover? Would that be – would it make any difference? Your Honor, in a different context. So in this case, the allegation is on the part of Mr. Gasparino that Mr. Friend apparently was helping people commit traffic violations or get away with traffic violations. There is – in a different set of facts, in the traditional criminal law, it could be the case in different facts that a person could knowingly engage in, let's say, accessory liability or conspirator liability by wanting to participate and warn people or help them evade detection. But, of course, the usual traditional protections apply there inasmuch as the person – the government would have to show the person intended to do that. And a person who simply observes a policer in the area and tells other people that the police are present doesn't come within the distance of the criminal law in that respect. Well, but Mr. Barry – Here, of course – Mr. Barry, excuse me. You're right that if someone were prosecuted for such behavior, the government would, of course, have to prove that intent beyond a reasonable doubt. But in the example Judge Sullivan gave, I'm not sure that at the time that the person is holding up that sign and an officer intervenes, is – you're saying the officer has to have proof beyond a reasonable doubt as to the person's intent? I mean, isn't it fair enough – No, you're right. Not necessarily that this is even a pre-existing member of a conspiracy. In other words, suppose someone finds out that his brother is robbing a bank and then he heads down to the bank to maybe even try to stop him. But on the way he sees a police car coming. So he races there and says, the cops are coming. And the cop has already gotten there and hears that. That would not justify an arrest? Your Honor, on those facts, I think it would. Our facts, I say, are completely apart in this matter. But why? Is that because a bank robbery is a big crime and talking on a cell phone while driving is a lesser offense? Is that the line we're drawing here? Well, in this case, Your Honor, yes. As a matter of Connecticut law, traffic offenses are not crimes. They are by statute set apart from crimes that may not be treated as convictions. That's one reason. The second is that traffic offenses in Connecticut rely solely on the actions of the driver. Responsibility for adhering to the traffic code can only rest with the driver. There's no such concept, for example, as saying, oh, well, my passenger egged me on to failing to use my turn signal. And any government theory of a driving violation that's centered on the behavior of a passenger doesn't have any meaning. So nothing that Mr. Friend could have said could take responsibility for adherence to the traffic code off of the driver's shoulders. There's simply no way in which he could make sense of that. None of those things take responsibility off the principal offender. But is, you know, there are two levels at which this operates, right? One is, not is this a matter of public concern or not, which seems to me the wrong inquiry, but is it something other than a statement? Is it a warning, for example? Does that somehow take it outside First Amendment protection? And then secondly, it may come in at the level of is there a compelling government interest in enforcing the law? Well, Your Honor, I think when the reason I say it's distinct when we come to we're talking about a traffic violation is that there just isn't any concept that are connected to law, accessory or conspirator liability for traffic violations. So they're just the whole concept with respect to the facts of this case don't apply. I think, however, to get to the second part of your question, there is a line between a person who's merely repeating something that they can see with their own eyes. For example, information that the police are in the neighborhood, which in a variety of neighborhoods in this circuit would be information that many people would find interesting because they find it the least dangerous. There's a difference between that and a person who, for example, agrees or sets about to look to act as a lookout to assist in the accomplishment for a particular criminal act. In this case, there was nothing. What if you take it upon yourself to be a lookout? The undercover example or something like it that Judge Sullivan gave, you know that there's a guy dealing drugs across the street. You don't have a stake in that venture. You're not involved with him. But you don't like the police and you don't like the drug laws. And you happen to know that a person standing across the street from the drug dealer near you is a cop. And you yell across to the person that you know is dealing drugs, this guy's a cop. Is that protected expression in your view? Your Honor, I think in those facts it could be the case that the person could be prosecuted for the interference statute that was at issue here. But I think there's a difference between even unilaterally inserting oneself into a criminal enterprise for whatever reason and merely repeating for the benefit of the general public something that you think may be of interest. Well, but the question of whether it's for the benefit of the general public is not – I'm not sure how that plays in. The question is, is it – why is it unprotected speech even in the this guy's a cop scenario? Is it because there's a compelling interest in preventing this kind of behavior? If he just walks around, he doesn't know whether there's anybody in particular dealing drugs, but he sees this guy on the street in plain clothes and he suspects that he's a narc and he goes around with a sign behind the fellow saying this fellow is a cop. Is that – that would be sort of like this, wouldn't it? It would be a little farther out, Your Honor. I mean I think that the only way in which speech crosses into sanctionable criminal conduct as you've described is if it is – we've known since the 1940s if it is integral to the criminal act itself. So I think the example of a person who for whatever reason gets a B in his bonnet thinks that someone in the neighborhood is an undercover cop and wants to follow him around with a sign, it's not clear to me that doing that would be integral to any criminal conduct. So that would be acceptable, right? Because here he is kind of – I mean I suppose you could think about this as there's somebody talking on his or her cell phone in the car, and they should get a ticket, and then he warns them that there are cops ahead, so they put the cell phone down. I mean isn't that very similar to the scenarios that we've been talking about? No, I think they're different, Your Honor, for the reason that I pointed out in Connecticut law, which is that there is only ever one person who can be responsible for a traffic infraction, and the traffic infraction is only occurring if it's observed. Well, Connecticut law – I mean I noticed we have these state cases where the Connecticut – I mean I understand this isn't exactly the same issue, but since the Connecticut courts have said that protected speech is not subject to the police interference statute, there have been cases in Connecticut where somebody said the cops are coming, even asked somebody to lie to the cops, and the Connecticut courts have said that that's not covered by the police interference statute because it's protected speech. Isn't that right? That's right, Your Honor. I think that a hypothetical about a person who is giving warnings occurs at the very, very edge of where the First Amendment would permit speech to be censored by the government. Yeah, can I ask you about the municipal liability before you're done? So the $25,000 bail was not itself set according to a custom or practice of the municipality. You're saying there's a custom or practice of letting the officers set the bail, but the $25,000 itself is obviously an outlier. You yourself argue that it was an outlier among bail that's set. So how can we say that that's a policy of the municipality if it really was the decision of the individual officer? Well, Your Honor, two things. One, that the complete vacuum of guardrails creates a situation, as you can see from the record, which we have a lot of information from the state bail commissioner about bails that were set. You see the numbers vary quite incredibly. And the constitutional infirmity is that these employees were cut loose to make their own decisions about the parameter of bail and then apply those decisions on their own. So what is that? Is that like a failure to train claim? You're saying that they should have trained the officers in setting bail? Is that right? Well, it's not just the failure to train. You make this argument that it's according to a custom or practice by the municipality, but Officer Gasparino did not look to a custom or practice when he set the $25,000 number, right? Yes, Your Honor. I think in that case, what I'm really pointing at is custom as it's used in check. So custom or usage, not the freestanding custom theory of Monell liability. I also think, as we raised in our briefing, that there is a pretty succinct way to cut through and follow the delegation argument to the end that results in Stanford's liability. And that's for the following reason. We have broad agreement amongst the parties and even in the district court that the delegation chain went from the state statute investing the municipal police chief with the ability to set bail. And then there's an express delegation in writing that was referred to as Police Procedure 120 that devolved it to, amongst other people, the desk supervisor on any given shift. Now, after that point, the parties diverge. However— No, I get that. But then your argument is that the law actually invests the officer or maybe the law invests somebody else in pursuing it to a delegation and ends up with the officer with policymaking authority for setting bail. And so then you're saying each individual officer in this circumstance is a policymaker for the municipality. Is that right? That's correct, Your Honor. I would also note— —that cases which might follow very different standards, you're saying, is all tantamount to municipal policy. I mean if we hold the—if we say there's municipal liability, it means we think the municipality is the moving force behind the determination. But what you're describing is lots of officers acting individually. In fact, you have a specific argument that here this particular officer acted unreasonably outside of normal parameters. It's just—do you see how it's hard to say that that really is—that the $25,000 bail therefore could amount to the policy of the city of Stanford? Well, we know, Your Honor, that Penn Bauer teaches us that it's entirely possible for a municipality to make a serious or disconnected set of decisions that each bear municipal liability. But it's the absence that creates the conditions under which a sort of trench— But Mr. Bennett, how is this different from ordinary decisions that police make as a matter of discretion on the street? They decide how much force to use. They decide what quantum of evidence they're going to apply in deciding that they think they have probable cause to make an arrest. These are all decisions that are made individually by each officer, right? That doesn't make them the policymaker simply because each officer has the discretion to do it. In all those cases, we say there's no municipal liability unless, as Judge Menasche was suggesting, somebody in higher authority has set a policy that says when you have X, Y, and Z, you can make an arrest. Or you are allowed to use a chokehold or you're supposed to use a chokehold in this situation, right? So how is this different? It's different in the thundering silence of the municipality on this subject. There is, as best I can tell, a single sentence that's been written down by the city of Stanford as to how employees are to execute this duty. That's entirely unlike the use of force prior to your arrest and things like that. It seems pretty similar to what judges are told to do when they're exercising discretion over bail. Basically reasonably—what's reasonable to ensure a person's future appearance. Do you think judges are getting more training or more guidance on that same question? They are, Your Honor, in the form of the common law, in the form of the court rules. Well, may I ask a slightly different question here about the—you say, I think specifically in the brief, that the police officer, the sergeant here, is the final authority on bail. But he's not, right? In fact, in this very case, he was overruled by the bail commissioner. And I guess one of the things I was thinking about when I was thinking about what things that police do all the time that we don't think of as Monell situations, police officers in New York, where there is a night court that you can go to, decide whether to give somebody a desk appearance ticket, in other words, a summons, come back to court on a given day, and that's it, and you go free, or to arrest them. And if they choose to make the arrest, then you have to take them before a judge. And there is a judge. But it's not surprising that if somebody's arrested at 4 o'clock by the time they're processed, et cetera, et cetera, it gets to be 1 in the morning before they see a judge. How is that different than this case, where the officer sets a bail, but there is a procedure, maybe a little haphazard, but there is a procedure by which somebody else is supposed to come down to the station house and check that out and has the absolute authority, as far as we can see from this case, to just say, no, go home, be on your own recognizance. Why is that different than the officer is free to decide whether to arrest the person, in which case he has to sit in jail until he gets to see a judge? Your Honor, the presence of the state bail employee doesn't change the Monell argument at all, because in Monell, what we're ultimately trying to determine is responsibility, if you will, within the walls of the municipality. The fact that there was a state bail employee who comes through and has statutory authority to set a different bail doesn't address the question of whether – who was it within the municipality who took the final decision. But that undermines the other argument you were making before about the delegation of authority. It's a state statute that empowers the police chief and the desk sergeant to set bail, right? So that's authority that comes from the state, not from the municipality. So then maybe there isn't even a municipal policymaker. No, Your Honor. I raise that to say that ultimately in Connecticut and probably everywhere else in the circuit, the story ends as Judge Lund suggested, which is in front of a judge, typically a state judge. But the mere availability of review by a state official, be it a judge, be it one of the bail officials here, doesn't remove from the calculation that someone within the municipality on whatever level ultimately makes what we know as a Monell decision. So the mere fact that there was a state employee who came through with the ability to set a different bail doesn't solve the question. So the setting of bail here by the officer is a somewhat nominal thing. It's really not very different than just the decision to make an arrest that is going to lead to someone's detention for a certain period of time, after which someone who – as I understand it, these bail commissioners are not judges but they are judiciary employees – so I don't see why there's a problem with that system, that because this officer decided to make a decision that would result in the person being detained rather than set free for a couple of hours until he gets to see someone like a magistrate, a justice of the peace, some relatively low-level judicial employee who gets to make the real bail decision in the case, the decision that's going to determine does he have to post money or can he go home that same day. I realize it's the next day technically because it's one in the morning, but within a matter of hours. Why is – I just don't get why this is a municipal policy that somehow results in deprivations of liberty on a systematic basis. Well, you're wrong because unless and until the bail commissioner circulates, the police officer setting the bail is the final word. But that's the same with the disappearance ticket. It's the same with the decision to arrest a person in a larger municipality where you are going to get to see a judge, but maybe not until one in the morning. So how is that different? Are you saying that anyone – and I think we've got law to the contrary, but that the city is responsible for an NYPD officer choosing to make a discretionary decision to make the arrest, knowing that it's going to mean the person is going to spend a few hours in captivity, and he's the highest policymaker of the city of New York on that subject? Your Honor, yes. Under a different configuration of the facts, it could be the case that that's entirely possible. If the city chose, for example, to arm its police officers with zero guidance, zero rules, and unreviewable authority to make that decision, it could be the case that somewhere in the five boroughs there's a police precinct in which the police officers are doing that on the basis that violates the Constitution. That would be the same 1L problem. It's just a little difficult to fathom in the area of arrest where there's certainly background state law and there's almost certainly reams of information for those employees about how to make that decision and when to make that decision. Okay, Mr. Barrett. I'm sorry, did you have a question, Justice? I don't know. All right, we'll stop there. You've got three minutes to rebuttal, so we'll hear from you again, but we've got two other parties to hear from. So, Mr. Spector, you're here on behalf of the officers, correct? Thank you, Your Honor. May it please the Court, my name is Elliot Spector. I represent Richard Gasparino in this case. The first weakness in Appellant's argument is that he mischaracterizes and minimizes the purpose of the distracted driving operation in question. The grant at Joint Appendix 139 states the objective is to decrease fatalities and injuries as a result of crashes caused by driver distraction. Distracted driving results in over 400,000 accidents and over 3,000 deaths each year. No, look, I think we all get that. I guess the question, I mean, you know, we have drug laws for similar reasons because a lot of people die from drug overdoses. But the issue here is whether or not this sign, this particular sign, was protected speech, and if so, was what happened here, did it fall within the sort of narrow limits of when you get to regulate that kind of speech? So maybe that's where we ought to be focused. I mean, I think nobody's going to argue that preventing texting and driving is not important. We would argue that this is not protected speech. It did not express any opinion. It didn't talk about a topic. It's of no political or social value. Why does something need to express an opinion or talk about a topic in order to be protected speech? Well, I know you've discounted the issue of public concern, but that is at the heart of the plaintiff's argument that it is protected speech. So your view is if it's not something that you'd read in a newspaper, the government can go around censoring people who hold up signs on a public sidewalk? I think it goes to the weight of the First Amendment protection in this particular case and in every case. And in this case, Mr. Friend had a personal concern, allegedly, that the matter of the operation was underhanded because they used this spotter technique. And when we're weighing that against the strict scrutiny test, the compelling interest of protecting lives, that Sergeant Gaffney… You're saying there's a compelling interest in protecting lives, but something needs to be narrowly tailored, and there can't be any other means of effectuating the purpose. I mean do you think people would have died if Mr. Friend was not arrested? Sergeant Gasparino narrowly tailored the measures he needed to continue the effective distracted driving operation. He merely warned Mr. Friend that he was obstructing justice, that he was interfering with this operation. He merely took this piece of paper and told him not to turn. So he wanted to conduct the operation, but it's not as if he was effectuating the arrest of Mr. Friend because someone was about to die. The interest in protecting lives is more attenuated. You think that generally if you carry out your policy of doing these kinds of stops that eventually it will save lives. But for purposes of narrow tailoring, you're not saying there was no other way to protect lives but to arrest Mr. Friend. We're talking about the compelling interest that was recognized by Sergeant Gasparino. He could not foresee whether or not someone who may have put his phone down because he saw the cops ahead sign, whether that person at some time in the future would be driving, using his phone, and some innocent mother, father, or child might lose their lives. On the other hand, especially when it's on strict scrutiny, we say there really has to be a very close connection between the means that the government uses and the ends that's being sought to achieve. You've just described a very attenuated chain of events that maybe there was somebody in a car who wasn't using the – would have put down his phone there and not gotten a warning. And so some time later, maybe he wouldn't have cared as much about using his phone, and then somebody would have gotten affected. I mean that does not seem like a very direct relationship between the arrest of Mr. Friend and the loss of a life. It is certainly far less attenuating if you look at the purpose of the sanctions of issuing tickets, which is at the heart of this distracted driving operation. You issue tickets to people. They pay fines of $150 to $500. They recognize the significance of what they've done, and it is far more likely that they will not use their phones in the future, causing the risk of serious physical injury or death if they suffer the sanctions. So then you're saying there's no other way to do that, right? So could Mr. Gasparino have asked Mr. Friend to go to a different location to protest the setup? Mr. Friend had the right to go to another location, to write to anyone, to speak to anyone, to communicate electronically with anyone. His First Amendment rights were not chilled in any way. The only objective of Sergeant Gasparino was at this time, while they were effectuating this distracted driving operation, for him not to warn people of this particular operation. But if he did that online, that would still be the same problem, right? So if he posted online, cops at the corner of walk and don't walk, get off your phones, your view is you could order him to take that down and prosecute him for it, right? No. I have no idea who he would have reached if he was online sending this particular message out that police officers were at a particular location. Okay, and so if Waze, if Waze, I'm sorry, I'm sorry, it's tricky with the Zoom. Sometimes we talk over each other and I apologize. But if Waze or one of the other electronic traffic directing sites indicated cops ahead that is designed to induce people to stop speeding and stop texting, your view is that that could be taken down too? Well, I don't believe that any product service or person who contributes to increasing safety risk should be condoned. However, there is a great difference between Mr. Friend was doing and what Waze would do. Mr. Friend was standing there in full view at the curb line with this big sign indicating the cops were ahead. And that was being demonstrated to every single driver driving in the direction of the spotter who would notice they were talking on their phones. As opposed to Waze, which is something that, you know, many people, in fact, most people probably do not use Waze. And the reality of the situation is that these people who are driving by, you know, it's highly unlikely they would be having Waze on their phone. So you're saying he needed to be arrested because that was because he was communicating to too many people. He needed to be arrested because he was informed that he was interfering with the police operation. And one of the most common reasons is recognized by our courts, even recently, is that interfering arrests are made because people are informed by police officers that are interfering with their operation. And they refuse to comply with the police officer's instructions and act in a manner which directly contravenes the police officer's instruction. So that's why he was arrested. He was not arrested because he was merely holding a sign. In fact, he was merely told not to come back with a sign and given the opportunity to leave the area. So what are we to make? I mean, you've gone way over, but I do want to ask you a couple of questions. What are we to make of the fact that Connecticut law for this statute, the statute under which he was ultimately prosecuted, seems to disclaim that it's to be applied to situations where it's just a sign like this. In other words, it's limited to physical conduct and fighting words that are likely to inflict injury or incite a breach of the peace. That language is an issue. However, the more important issue in the law that you're citing, State v. Williams, is that the statute is confined to the scope of meddling or hampering the activities of the police, which Mr. Friend was clearly doing. It specifically states the statute prescribes conduct intended to obstruct police in the performance of their law. The Connecticut courts have narrowed that to avoid capturing protected speech, right? We have these cases where someone sent a text message to a potential witness saying to keep his mouth shut and the warning to the boyfriend in this Lamantia case that the cops are coming and you should lie to them. I mean, doesn't that, aren't those cases of much more direct interference with police than Mr. Friend? No. In those particular cases, which are pure speech cases, an individual obviously has the right to challenge police officers, to argue with police officers, to tell others not to cooperate with police officers, to tell people to remain silent. They have every right to do that under the First Amendment. This particular case is different. This involves actions and the, as I mentioned before… I'm sorry, it involves actions? I mean, if Mr. Friend was standing at the same street corner but did not have a sign, he was just standing there, would he have been arrested? No, he would not have been. Right, so it's the content of his sign that's the reason he was arrested. He was arrested because he was informed that he was obstructing the police officer in the performance of their duties. You just said that people have a right to instruct people not to cooperate with police, so if his sign said, cops ahead, don't cooperate with them, would that have been a different case than this one? No, he is specifically telling people that they can avoid the law, that they should avoid the law because police officers are ahead. Instead of saying cops are coming, you should lie to them, it said cops are coming, you should get out of the house. It would have been a totally different case because that would have been obstructing the proceeding as opposed to telling the recipient of the message not to cooperate with the police. Well, in a similar type of frame, it's protected speech to tell a witness to lie to the police, but it's not protected to tell a witness to avoid the police. I'm not sure if telling a witness to lie to the police in a certain context would not be tampering with a witness and that would be a violation of the law. Telling an individual who is subject to possibly an investigation or arrest not to cooperate with police is certainly something where you're informing them that they merely, you know, they have a constitutional right not to speak to the police. They have a constitutional right not to cooperate with police officers, so there's certainly a difference there. And if a person told police officers that Mr. Jones is not here in the house and Mr. Jones is a fugitive and is in fact in the house, the person is not being arrested merely for their speech. They're being arrested because they are harboring a fugitive. But we have this case, right? I mean you're describing the – we have this case, State v. Lamantia, where we have a Connecticut court where the defendant warned her boyfriend the cops are coming and asked that he lie to them. What we expect our police officers to do is to understand the law. When we're talking about 1987 cases or cases that are 15 or 20 years old that parse the law, we are expecting too much of police officers. That was a 2018 case. But then – but you're actually asking them to understand a very fine distinction because you're saying it is totally protected to say don't cooperate with the police. But if the speech crosses some kind of line between non-cooperation and interference, it would not be protected, right? That's what I'm saying that officers would understand. What officers would understand is the plain language of the statute which states that they can make an arrest if an individual is hindering the officers in performance of their duties. Mr. Spector, I'm not – We have a substantial amount of – whether the speech is constitutionally protected. If the state chooses not to, that may create a Fourth Amendment question if there's no probable cause to arrest this person for violating any actual statute. But it doesn't give the person a right to engage in certain conduct under the First Amendment simply because the state has not chosen to make it a crime. And the case law in Connecticut has allowed arrests for interfering when we have a mix of action and words that interfere with the duties of a police officer. What I'm saying is it's – Sorry, you can finish your response. It's difficult to ask officers to parse the difference between people who are speaking as well as people who are acting in a manner which interferes with their duties. That's a qualified immunity question, right? If the issue is it's – the police officer shouldn't be held liable in damages because the distinctions here are too subtle or weren't made clear enough by preexisting law, then your client wins. But that's different than he wins because the plaintiff here had no First Amendment right in question. That's a different question than the immunity of the officer. That hasn't been reached in this case. Assuming that there was a First Amendment right in question, and we will accept that as Judge Covello did, the actions of Sergeant Gasparino served a compelling government interest which overcame that First Amendment right. And I would agree that what I'm talking about pertains to a qualified immunity issue which was argued and briefed both at the district court level and at the appellate court level. And if you do not agree that Judge Covello's opinion, which was, we believe, well stated, if you do not believe that his opinion was correct, we would ask you to reach that qualified immunity issue. All right. Well, thank you. We'll now hear from Ms. Coghlan. I presume mostly about the Monell claim, but go ahead, Ms. Coghlan. May it please the Court, my name is Barbara Coghlan and I represent Stanford, the city of Stanford, in this action. This court should affirm the decision of the district court in granting summary judgment in favor of Stanford on counts four and five of Friend's amended complaint. This is the situation because Friend is unable to prove, based on the evidence before the court, that Gasparino was acting as a municipal policymaker when he said Friend's bailed on April 12, 2018. His actions were simply the action of a police officer, the discretionary decision as to what amount to set his bail for an arrest date. There is no evidence that would support the claim that he was actually acting on behalf of the city of Stanford when he did so. As your honors have pointed out in your questioning of Attorney Barrett, he violated, he went against training he received and he went against the policy when he set this bail amount. The cases that have been cited by the party, and in particular... Well, he went against the policy because the policy says reasonable and you're saying that his bail was not reasonable. Well, I'm saying the argument of Mr. Friend is that he went against the policy. Mr. Friend is saying that his bail was not reasonable. But what's your position? What's your position? Did the $25,000 bail, did that violate the policy of the city of Stanford? Well, if all of the factors that Mr. Friend says are true, then it may have violated that policy. What I do know is that... I'd just like to know if we know that for sure. I mean, what's the city of Stanford, right? So you have this, you have an officer who's an employee of the city of Stanford. He set $25,000 bail. Is that number consistent with the policy of the city of Stanford? The city of Stanford's policy is that the officer set a bail that's reasonable... Correct. So was the $25,000 bail number, was that reasonable? According to Sergeant Gasparino, he did it because he didn't believe, based on the actions of Mr. Friend, that he would be likely to appear in court. That is one element. I will say that... So does that mean that it was reasonable? So does that mean that it was... I'm not asking what Gasparino said or what Friend says. I'm asking what your client, the city of Stanford, believes. Was the $25,000 bail, was that reasonable? The city of Stanford hasn't had to answer that question. That is a question that the district court didn't reach. That's not an issue that the city actually ever... Yeah, but you're telling me that I should conclude that he was not a municipal policymaker because, in fact, he was subject to a policy that his decision conflicted with. But now you're telling me it might very well have been perfectly consistent with the policy. So maybe he was acting pursuant to the city of Stanford's policy, in which case, why shouldn't there be municipal liability? If you're not willing to say that it's inconsistent with the policy, then maybe there's a fact question as to whether actually he made the determination consistent with the city's policy. Based on the allegations of Mr. Friend, I would say that it was inconsistent with the policy. And in addition, Your Honors, I think that there's a more important factor here that whether or not he violated the policy of the city, he wasn't making policy. Very important to this issue is that he was a low-level employee within the municipal hierarchy. All of the cases that are considered by both parties in this case deal with people that are a much higher level. This court's decision in Augusta points that out, that in order to make someone responsible as a municipal policymaker, that individual must be high up in the municipal hierarchy. Sergeant Gasparino is just one step above the lowest level in the police officer's strategy. So in Augusta, there was the commissioner of education that the court could point to and say, well, that's the guy who sets the policy for teacher disciplinary proceedings. So we know that policymaking authority is vested in a higher-level official than the school principal. But here the argument of Friend is that there is a vacuum, that the municipality just lets all of the officers make the final decisions in this area. So why isn't this a different case because of that? Well, because the municipality has issued a policy, the policy number 120, that was issued by the chief of police. The municipality trains its officers. This is not a failure to train case. That claim was brought to the district court, and the district court agreed that there was training and that this action could not proceed under a failure to train claim. And Mr. Friend did not appeal that ruling by the district court. So based on the training and the policy, the city has acted as it should act. There was no reason, no indication that the officers needed any more guidance. No one has ever complained. So then you're saying that that policy is what constrained the officer's discretion. And you're saying, I guess because we're at a motion to dismiss, you're saying given the allegations of the complaint, the determination would have violated the policy or did violate the policy. This was actually under a motion for summary judgment. Oh, yeah. Okay. So it's a motion for summary. So then it's not just an allegation. So is your position that given all of the evidence that's been adduced so far, that the $25,000 determination violated the city's policy because it was not reasonable? Well, if in fact, we are taking the facts asserted by Mr. Friend for purposes of summary judgment to be true. If in fact, Gasparino disregarded his training and in fact, issued the $25,000 bond or bail on a whim, because he didn't like Mr. Gasparino, but Mr. Friend, then in fact, that would be a violation of the city's policy. Yes, that's accurate, Your Honor. And in all of the other cases in which the courts have been asked to consider whether or not a municipal employee was a municipal policymaker, no one has ever been at the low level that Sergeant Gasparino is. If Sergeant Gasparino were to be found to be a municipal policymaker in this case, that would mean that every other sergeant in the department who says bail, and there's a lot of them, would be municipal policymakers for the city of Stanford. That would be extremely chaotic and not what Monell envisioned, particularly. Monell says that the municipality cannot be responsible for the individual acts of an employee. That would be responding at superior liability, and that's what Mr. Friend is asking this court to find in this case. That Gasparino's actions, whether they follow policy or follow training or not, were the actions of the municipality. And I believe that this court cannot find that the actions of Gasparino were the deliberate action of the municipality based on the evidence that this court has before it. All right. Thank you, Ms. Coughlin. We'll now hear from Mr. Barrett for three minutes of rebuttal. Thank you, Your Honor. Your Honor, I only have two points to raise, and starting with an aspect of the case that was raised by Ms. Coughlin, as to the employees who engaged in bail setting, I do want to highlight that this is an unusual case in which one possible outcome is that the court finds there was proprionic ratification, which is something that rarely occurs, but as you recall, is a condition under which the municipality adopts a decision of a lower level decision-maker. On the eve of summary judgment, recall that the city of Stanford asserted that one of its employees who was working the death supervisor job that night can't remember with specificity, but averred that he would have engaged in some sort of review of the same materials, Mr. Gasparino reviewed with respect to Mr. Friend, and then left Mr. Friend's bail unchanged. That would be an accomplished proprionic ratification if the court simply resolves the dispute at the level of the death supervisor, which I think everyone agrees the death supervisor had the authority, the final decision-making authority under Monell. Mr. Friend believed that that authority extended out elsewhere, but the court doesn't even need to reach that. That's the ratification issue I want to highlight. The second thing that I want to highlight comes from Mr. Gasparino's argument, and I just want to note the central tension in his position with respect to what the public may or may not have understood about Mr. Friend's message. Mr. Gasparino in this litigation is at once contending that Mr. Friend's message made no sense, and it wasn't a coherent argument that the public would have understood it. However, he is, as the very basis of justification for his arrest of Mr. Friend, saying that, in fact, motorists well understood what Mr. Friend meant, put their phones down, and as a result, in his words, caused the police not to observe as many violations as they should have been observed. It can't be both things. Mr. Barr, can I just ask you quickly? I mean, so there's several steps along the way, and are you asserting a First Amendment claim with respect to each of them? The removal of the first sign, the removal of the second sign, the arrest and prosecution after the second sign. You're asserting each of those is a First Amendment violation, right? No, count three, Your Honor, is the malicious prosecution. No, no. So that's actually the fifth. Okay. But, I mean, so your view, it's the same analysis, whether it's just put the sign down, or taking the sign and telling him to move along as arresting him. That's right, Your Honor. The first two counts, you've got a physical intervention to stop the speech. First is the snatching of the sign. The second is a physical apprehension of Mr. Friend and his arrest to stop his speech. Are you making a Fourth Amendment claim that there was, even if this was unprotected conduct, it's conduct that's not prohibited, or at least the officer had no probable cause, in light of the way the Connecticut statute was interpreted? Is that part of your case at all? Or is it exclusively a First Amendment case? It's a little confusing in that it's sort of the First Amendment wrapped into the Fourth. We think by virtue of the First Amendment, by the Connecticut Supreme Court's rule in New Williams, there can never be probable cause for a 53A, 167A violation where the sole basis for the violation is protected speech. So if, for one reason or another, the court concludes that Mr. Friend was engaged in not protected speech, then we lose the probable cause argument. Okay. Do you think that—so do you agree—I guess an opposing counsel asked us to reach the qualified immunity question if we agreed with you on the other issues. Should we do that, or is that something that should go to the district court? How would we resolve a qualified immunity question? No, Your Honor, as this court does all the time, it typically defers questions not resolved by the district court for the district court itself.  Now, as your colleague, Ms. Coughlin, revealed, there's no concern here about the loss of immunity to suit. Mr. Gasparino did not raise qualified immunity in a motion to dismiss. The suit has been litigated from suit to nuts, including discovery. So at this point, the court should answer the merits question, and then if it sees fit to have the qualified immunity question addressed, return that to the District of Connecticut. All right. Well, thank you all very much. We will reserve decision. We'll now move to the final argument, Your Honor.